1

1                       UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF NEW YORK
2

3    - - - - - - - - - - - - - - - X

4    UNITED STATES OF AMERICA,    :    19-CR-239(RJD)

5              Plaintiff ,        :
                                         United States Courthouse
6        -against-               :     Brooklyn, New York

7    CHRISTOPHER WALKER,          :
                                         March 31, 2020
8              Defendant.        :     9:30 o'clock a.m.

9    - - - - - - - - - - - - - - - X

10
            TRANSCRIPT OF BAIL APPLICATION BY TELECONFERENCE
11            BEFORE THE HONORABLE RAMON E. REYES, JR.
                   UNITED STATES MAGISTRATE JUDGE.
12

13   APPEARANCES:

14
     For the Government:          RICHARD P. DONOGHUE
15                                United States Attorney
                                  BY: ANDREW ESTES
16                                Assistant United States Attorney
                                  271 Cadman Plaza East
17                                Brooklyn, New York

18
     For the Defendant:          MARK O'MARA, ESQ.
19                                FRITZ SCHELLER, ESQ.
                                  TAMA BETH KUDMAN, ESQ.
20

21
     Court Reporter:             Charleane M. Heading
22                                225 Cadman Plaza East
                                  Brooklyn, New York
23                                (718) 613-2643

24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer-aided transcription.


              CMH      OCR      RMR      CRR      FCRR

2

1          (All present by teleconference except defendant.)

2          THE CLERK:  This is criminal cause for bail

3    application.  USA versus Christopher Walker.  The case is

4    19-CR-239 via teleconference.

5          Can the attorneys please state your name for the

6    record starting with the government, please.

7          MR. ESTES:  Good morning.  Andrew Estes for the

8    government.

9          MR. O'MARA:  Good morning, Your Honor.  Mark O'Mara

10   joined by Tama Kudman and Fritz Scheller.

11         THE CLERK:  Great.  Thank you.

12         THE COURT:  Good morning.

13         I have read through the various submissions going

14   back to the revocation hearing in front of Judge Orenstein so

15   I have an understanding of what's gone on, what's going on,

16   and I'm prepared to release Dr. Walker temporarily on a bond

17   given the current situation in the country and the facility.

18   So we can just move ahead with that but I want to give the

19   folks, the government and Mr. O'Mara, to make any presentation

20   they want to before we go forward with that.

21         MR. O'MARA:  Mr. Estes, do you want to begin on your

22   side?

23         MR. ESTES:  Yes.  Thank you.

24         Your Honor, very briefly, this is Andrew Estes on

25   behalf of the government.  I think we've set our position out

3

1   in the filings and hearings.  If Your Honor has any questions,

2   we're, of course, available to answer them but, otherwise, we

3   do not oppose the request for the temporary order of release

4   as stated in our recent letter.  We do continue to reserve the

5   right to seek the reentry of the permanent order of detention

6   at the appropriate time.

7          MR. O'MARA:  And if I might respond, obviously, we

8   have been working behind the scenes to try to accomplish

9   Mr. Walker's release so we are very good with the conditions

10  placed or mentioned by the government.  It is certainly our

11  hope that, understanding that he will be quarantined for the

12  next couple of weeks as he will need to be once he comes back

13  to Florida, that at some point, probably in short order, we

14  will be readdressing this hopefully to this court if

15  appropriate.

16         Dr. Walker will want to get back to work.

17  Particularly, he has a hospital where he has privileges and

18  they are looking for doctors including retired doctors trying

19  to help out with everything that's going on.  So my hope is

20  that we can work this through with the government and that we

21  might need to make application back to the Court in short

22  order hopefully in a similarly stipulated chain so that he can

23  begin employment.  Not only does he have his own business

24  where he's got 15, I guess, 20 employees he's trying to keep

25  employed but obviously, as a medical care provider, he can

4

1    assist with what's going on here in Tampa, Florida.

2             THE COURT:  Well, in relation to early release,

3    because I think it's part of this, I have a couple of

4    questions before I talk about other things.

5             As I understand it, the government does not object

6    to release on the following terms.  I may have been frazzled,

7    I had some of my own questions, but I want you to know where

8    I'm coming from.  $1 million bond.  Travel restrictions to New

9    York City, Long Island, Florida and Massachusetts.  No contact

10   with co-defendants, victims or witnesses unless in the

11   presence of counsel.  Surrender of passports to the extent

12   that hasn't already happened and no applications for any

13   passports or international travel documents.  Pretrial

14   Services supervision subject to random home and workplace

15   visits and reporting as directed.  Two sureties and a

16   third-party custodian, the sureties being Dr. Siddiqui and

17   Sekou Clarke.  The third-party custodian is Rhonda Webster.

18   And continuation of this temporary release to be reevaluated

19   on June 15th.

20            That is, if I am correct, the next date I'm on

21   arraignment duty and I think it makes sense to have some

22   continuity rather than bounce around from judge to judge.  If

23   there is a need to reevaluate the continuation before then,

24   you can make an application.  If you have to, that's fine but

25   I would like to put it on at least as a placeholder on

5

1    June 15th at an appropriate time and I'll leave it to Sui-May

2    to figure out what time.

3              Those are the terms.  I know in the original

4    Pretrial Services report, there was discussion of firearms but

5    that is a standard condition of our release at the end of the

6    bond, the back page of the bond.  I understand Dr. Walker's

7    father has rifles and all that so that shouldn't be an issue.

8              Are there any other terms that the government would

9    have me put in the bond?

10             MR. ESTES:  Yes, Your Honor.  Andrew Estes again for

11   the government.  We do believe that home detention at this

12   time is still appropriate for the bond.

13             THE COURT:  Why is that?

14             MR. ESTES:  Well, Your Honor, the reason for the

15   initial revocation did relate to the defendant's attempted

16   witness tampering and we believe that that is at least what

17   would be needed to mitigate the possibility of returning to

18   that kind of misconduct even on temporary release.

19             If, as Mr. O'Mara had mentioned before, if there is

20   a specific request that comes up in the future, being able to

21   return to some form of employment at a hospital, we would

22   certainly consider that specific request, but at this time, in

23   light of that misconduct leading to the revocation, the

24   government thinks that home detention is appropriate.

25             THE COURT:  Mr. O'Mara, do you want to respond?

6

1          MR. O'MARA:  Yes, Your Honor, if I might.  Again, I

2   hesitate to relitigate some of the issues particularly when

3   Mr. Estes and the defense team worked together to get this

4   before you, this agreement, but just to respond quickly, the

5   allegation is Mr. Walker had a very momentary conversation

6   that something like changed these records in one conversation

7   with a then employee of his.  Over the next 10 days when they

8   were still working together, nothing else was ever said about

9   that and no check back, no did you do it, let me see the fixed

10  records or something like that.  So questionable is her

11  credibility in this regard and, of course, that happened many,

12  many months ago back in the May-June arena or timeline and

13  nothing ever happened since.

14          The government charged several months later, I think

15  it was five or six months later, charged him with the

16  tampering but in the intervening time of five months, there

17  was again never a reach-out to this one witness nor was there

18  any allegation or suggestion that there was a reach-out or any

19  inappropriate activity with any other witness involved in the

20  case.  So while I understand the government's position

21  regarding tampering and it is an issue of great concern to the

22  court, Dr. Walker has shown that the credibility of Ms. Exum

23  is more at issue than her.

24          Having said that, more importantly, he is a medical

25  doctor with an active practice here.  We've kept, and

7

1   Ms. Webster who is on the phone who is now sort of the office

2   manager, keep everything a life person at the office can

3   testify that they're keeping I think about 15 or so employees

4   employed right now trying to keep his practice alive, but if

5   Dr. Walker has an opportunity to work in it and literally only

6   to work in it or be at home or be at his lawyers, then he can

7   keep those people employed.

8            Secondarily, as mentioned a moment ago, the Advent

9   Health hospital or health care system is literally looking for

10  people to help out there and it truly is a medical crisis so

11  my thought is if you will allow him to work in his practice

12  and with that hospital providing whatever services they want

13  him to, then it would, one, keep him busy, keep him productive

14  and keep him employed and actually have him, you know,

15  somewhat give back to the community.  We often have our

16  clients go do community service work.  I'm not sure what

17  better community service work Dr. Walker and any other medical

18  provider can do in this crisis time so that's my hope.

19            THE COURT:  Mr. Estes, do you want to respond

20  briefly?

21            MR. ESTES:  Yes, Your Honor.  If I could respond

22  briefly on the point of return to employment or at another

23  hospital facility.

24            Again, if there is a specific request for a hospital

25  that needs his services, if such a request is made,

CMH        OCR        RMR        CRR        FCRR

8

1    particularly if there is, as the government suspects there

2    might be, some time of self-quarantining, it's not that he's

3    going to be able to return to the field immediately anyway

4    but, otherwise, the government's understanding of the

5    defendant's request for the compelling reason under

6    Section 3142 was the risk to Dr. Walker's health for being in

7    the MDC at this time based on the health history that defense

8    counsel has provided.  So for that reason, that's why the

9    government does not object to the temporary release from MDC

10   in order to mitigate that risk to his health given his own

11   personal health history and thinks that being in home

12   detention will satisfy the government's concern as well as his

13   own health.

14            THE COURT:  What I'll do is I'll add the home

15   detention electronic monitoring suggested by the government.

16   He'll be restricted to home at all times, except for attorney

17   visits, court appearances, medical treatment and employment or

18   other activities as approved by Pretrial Services.

19            After his two weeks of quarantine, if you will, as

20   long as he works it out with Pretrial Services, he would be

21   able to work at his medical practice or otherwise as long as

22   Pretrial agrees to it.  Is it the Middle District of Florida?

23            MR. O'MARA:  It is, Your Honor.

24            THE COURT:  Okay.  Now, I have a question about the

25   ownership of the various suites at 801 North Warren Avenue in

CMH        OCR        RMR        CRR        FCRR

9

1   Orlando.  Are they owned by Dr. Walker or another entity?

2            MR. O'MARA:  They are owned, and I'm going to bring,

3   if I might bring Rhonda Webster in in a moment, but they are

4   all owned by subsidiaries of a company called Med-Surge, which

5   is an LLC wholly owned by Dr. Walker.  So all of these suites

6   are entirely owned by Dr. Walker or an entity that he has a

7   100 percent ownership in.

8            If I might, for a moment to clear up the Court

9   because there is, they're not direct on title in his name,

10  Ms. Webster, can you shed some insight on that?  And first you

11  can acknowledge to the Court who you are.

12           MS. WEBSTER:  Yes.  My name is Rhonda Webster.  I am

13  the practice administrator for Dr. Christopher Walker.  And

14  the suites on the seventh floor of the 801 building, yes, are

15  owned by Med-Surge Consultants which Dr. Walker is a

16  100 percent owner of.  There are different corporate names but

17  they all fall under Med-Surge Consultants which he owns every

18  single one of them.

19           THE COURT:  All right.  And you, Mr. O'Mara, do you

20  know what occupant filed with the county clerk of Florida to

21  secure the bond?

22           MR. O'MARA:  The plan was, and, you know, we had

23  started this process a few days ago and I had actually crafted

24  what we sort of determined to be a promissory note of sorts

25  and to the benefit of the government to accomplish this, but

10

1   we can certainly simply do what is more traditionally a surety

2   bond securing those properties.  The hope was doing it in a

3   way that was acceptable to the government just so we can

4   accomplish it in short order so we can accomplish $1 million

5   bond because we have about $3 million worth of equity in those

6   assets that we just spoke of.  The hope was to do it rather

7   than taking a delay time of incorporating a separate surety

8   since we have two live people in on this call who are willing

9   to sign off on it as well and that we can draw up an

10  assignment or an interest in favor of the government that

11  would become due and payable upon bond violation.

12          I don't know if this court had an opportunity yet to

13  look at the plan document that we had worked out, but I think

14  working with Mr. Estes, we can accomplish that this morning or

15  today.  I just want to do it in a way that gets Dr. Walker out

16  as soon as possible.

17          THE COURT:  Well, as soon as I sign this bond,

18  Dr. Walker can be released.  As part of the bond, I was going

19  to indicate that confession of judgment, mortgage or lien in a

20  form approved by the United States Attorney needs to be

21  executed by April 8th.  I mean, I really don't care.  It

22  doesn't matter.  It matters more to the U.S. Attorney's Office

23  as to whatever style or bond agreed to secure their position,

24  so to speak.  So I'll leave that to you folks to determine it.

25  I've never dealt with condos in Florida.  I don't know how you

11

1   would secure them.  So I'll leave that up to you.

2           What about any additional terms?  Anything you

3   suggest, Mr. Estes?  Speak now or forever hold your peace.

4           MR. ESTES:  No, Your Honor.  I believe everything

5   has been covered at this point.

6           THE COURT:  We have Dr. Siddiqui and Sekou Clarke on

7   the line, is that correct?

8           MR. O'MARA:  That is correct.

9           THE COURT:  I'm going to ask you folks some

10  questions so if you could you respond to the following

11  questions, I'd appreciate it.

12          Do you swear to tell me the truth, the whole truth

13  and nothing but the truth?

14          DR. SIDDIQUI:  Yes.

15          MR. CLARKE:  Yes.

16          THE COURT:  I take it that Mr. O'Mara explained to

17  you when it means to sign a bond?

18          DR. SIDDIQUI:  Yes.

19          MR. CLARKE:  Yes.

20          THE COURT:  Do you understand if you sign this bond

21  and Dr. Walker violates the terms of his release, you are

22  liable to the government for $1 million?  It's a lot of money.

23  The government can come after you for that money to the extent

24  there's not a sufficient equity in these, in these condos or

25  they just come after you straight.  It doesn't have to first

12

1   go after the condos.

2           Do you understand that?

3           DR. SIDDIQUI:  Yes.

4           MR. CLARKE:  Yes.

5           THE COURT:  Dr. Siddiqui, how long have you known

6   Dr. Walker?

7           DR. SIDDIQUI:  Two to three years.

8           THE COURT:  And what about you, Mr. Clarke?

9           MR. CLARKE:  Over 10 years.

10          THE COURT:  Mr. Estes, have you had the opportunity

11  to confer with Dr. Siddiqui and Mr. Clarke to make sure that

12  they're adequate sureties?

13          MR. ESTES:  We have not, Your Honor, but I had hoped

14  to at least just briefly cut to it at this conference.

15          THE COURT:  Okay.  Dr. Siddiqui, what is your

16  approximate income per year?

17          DR. SIDDIQUI:  I would say in the range of 200 to

18  250,000 a year.

19          THE COURT:  What about you, Mr. Clarke?

20          MR. CLARKE:  I'd say in the range of 550 to 600,000

21  per year.

22          THE COURT:  Okay.  Do you need more than that,

23  Mr. Estes?

24          MR. ESTES:  Just briefly, whether each of the

25  proposed suretors own any property in their own names.

13

1          THE COURT:  Dr. Siddiqui, do you own any property?

2          DR. SIDDIQUI:  I do own some properties, my

3    residence and some land.

4          THE COURT:  And your residence, is there some

5    available equity meaning the value of the property is greater

6    than whatever mortgage or loans you have on it?

7          DR. SIDDIQUI:  Yes.

8          THE COURT:  Do you know the approximate amount of

9    equity that you have?

10         DR. SIDDIQUI:  About 3 million.

11         THE COURT:  And what about you, Mr. Clarke, what

12   kind of equity is there?

13         MR. CLARKE:  I think between three properties,

14   there's probably 400,000.

15         THE COURT:  Okay.  And Ms. Webster, you've spoken

16   already.  I have to ask you the same question.  Do you swear

17   to tell the truth to the questions I'm going to pose to you?

18         MS. WEBSTER:  Yes, Your Honor.

19         THE COURT:  Did Mr. O'Mara explain to you what it

20   means to be a third-party custodian?

21         MS. WEBSTER:  He did.

22         THE COURT:  Okay.  And is this something you're

23   willing to do?

24         MS. WEBSTER:  Yes, Your Honor.

25         THE COURT:  Sui-May, at some point, we need the

14

1    third-party custodian form.

2              THE CLERK:  I will e-mail it to Mr. O'Mara to get, I

3    guess, her signature.  Yes, I will get it to you, Mr. O'Mara,

4    the form.

5              MR. ATKINSON:  This is Shavoy Atkinson from Pretrial

6    Services.  You should send it to defense counsel because it

7    needs a signature for Pretrial Services on the form.

8              THE CLERK:  Thank you, Shavoy.

9              THE COURT:  All right.  This bond needs to be signed

10   by the sureties.

11             Dr. Siddiqui, do you authorize me to sign on your

12   behalf?

13             DR. SIDDIQUI:  Who is this?  I'm sorry.

14             THE COURT:  This is the judge.

15             DR. SIDDIQUI:  Okay.

16             THE COURT:  Ordinarily, you would be in court in

17   front of the Magistrate Judge and you would actually

18   physically sign the bond.  Because of the situation, we're

19   doing everything telephonically and we ask the sureties for

20   authority to sign the bond on their behalf and what we do is

21   put on the bond, "/S/ Dr. Irfan Siddiqui by Magistrate Judge

22   Reyes."

23             DR. SIDDIQUI:  Yes.

24             THE COURT:  That would be your signature.  Do you

25   authorize me to do that?

15

1                DR. SIDDIQUI:  Yes.

2                MR. O'MARA:  It's basically a verbal order.

3                THE COURT:  It's on the record.  This conference is

4     being recorded so we have a memorialization of it so you're on

5     the hook, so to speak.

6                Mr. Clarke, do you authorize me to sign the bond on

7     your behalf as well?

8                MR. CLARKE:  Yes, Your Honor.

9                THE COURT:  Okay.  Great.  So what I will do is I

10    will sign this bond for the sureties, I will sign it myself

11    and, Mr. O'Mara, if you authorize me to sign on behalf of your

12    client, I will do that also.

13                MR. O'MARA:  Yes, sir, I do.

14                THE COURT:  Tomorrow, once he's released, we will

15    have another telephone conference where I actually give him

16    the warnings and tell him what the terms and conditions are.

17                MR. O'MARA:  Yes, Your Honor.

18                THE COURT:  Okay.  So I will sign everything, we

19    will get the bond to MDC, Dr. Walker will be released and

20    we'll have the forms sent to Mr. Atkinson and he will get it

21    back to us.  I would like that no later than the end of this

22    week and we're good to go.

23                MR. O'MARA:  Great.  Thank you very much for the

24    time, Your Honor, and allowing us to do it in a somewhat

25    informal way realizing everything we're all dealing with.

16

1          THE COURT:  My pleasure.

2          Mr. Estes, do you have anything?

3          THE CLERK:  Judge, this is Sui-May.  So you'll

4  e-mail me the bond and I'll distribute it to the appropriate

5  parties.  Once he's released, I didn't hear you, did you want

6  a conference tomorrow with Dr. Walker to give him his bail

7  warnings?

8          THE COURT:  Or Wednesday.

9          MR. O'MARA:  If I might, Your Honor, the plan is

10  according to when he gets out today is getting him back to

11  Florida as soon as we can.  My thought is that he will be

12  either driving back or if he can fly back, fly back tomorrow.

13          I might ask that we want to set a time or date for

14  the conference call, that we do it Thursday, maybe even

15  Friday, but whenever we -- I can be certain that he's here

16  back there in Florida.

17          THE COURT:  Let's do it Friday because I'm not on

18  the schedule until Friday.  Let's do it 3 o'clock on Friday.

19          MR. O'MARA:  Great.

20          THE CLERK:  Okay.  3 o'clock.  If anything changes,

21  Mr. O'Mara, just send me an e-mail please.

22          MR. O'MARA:  I definitely will.

23          THE CLERK:  And Judge Reyes, I think you mentioned

24  about the bond.  Did you say June 15th?

25          THE COURT:  June 15th.

CMH     OCR     RMR     CRR     FCRR

17

1          THE CLERK:  We'll schedule it for 11 a.m.?

2          THE COURT:  Sounds good.

3          THE CLERK:  June 15th at 11.

4          THE COURT:  And, again, if things come up before

5    then that are negative and you want to make an application,

6    either side, go right ahead.

7          MR. O'MARA:  Yes, Your Honor.

8          MR. ATKINSON:  And if I may, this is

9    Officer Atkinson, we had reached out to the Middle District of

10   Florida who will be supervising on our behalf of the EDNY and

11   they asked if we can set up the equipment monitoring here

12   because their office is closed in the middle of Florida and in

13   the situation with someone coming to Florida, they are not

14   going to be able to have contact with him.  So we are going to

15   set up the equipment here and we'll watch him until he gets to

16   his home there and they'll take over the case once he's on his

17   way home.  So, Counsel, we'll get the location as soon as he's

18   released.

19         MR. O'MARA:  That would be great, yes.  Whatever we

20   can do to expedite that, I would appreciate it.  Thank you.

21         Thank you very much for the time.  Again, I

22   appreciate it.

23         THE COURT:  Thank you, everyone.

24         (Matter concluded.)

25